UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:09-CV-175-BR

| | | |
|---|---|---|
| ERIC M. MCMILLIAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| L.G. LECONEY, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the court on the 28 February 2011 motion for summary judgment

(DE # 34) filed by defendant Detective L.G. LeConey of the Raleigh Police Department

("LeConey").[1]  Plaintiff Eric M. McMillian ("plaintiff") has filed several documents in response

to the motion, including several declarations.  (DE ## 38, 40-42.)  The motion is now ripe for

disposition.

## I.  BACKGROUND

A.    Procedural Background

Plaintiff, proceeding *pro se*, instituted this action pursuant to 42 U.S.C. § 1983 on 16

April 2009.  Plaintiff appears to allege that on 31 March 2009, he was subjected to a false arrest,

an unconstitutional seizure, and an unlawful search of his person.[2]  (See, e.g., Compl., DE # 3, at

5-6; Pl.'s Decl., DE # 38, at 3; Pl.'s Decl., DE # 42, at 3.)  He also contends that LeConey used

---

[1] LeConey currently holds the position of Detective in the Raleigh Police Department.  However, at the
time of the events relevant to this action, he held the position of Senior Police Officer.  (LeConey Decl., DE # 35-1,
¶ 2.)

[2] The warrantless arrest and the unconstitutional seizure are actually the same claim because the arrest and
seizure occurred simultaneously.  Wells v. Bonner, 45 F.3d 90, 94 n.1 (5th Cir. 1995); Wilkerson v. Hester, 114 F.
Supp. 2d 446, 450 n.2 (W.D.N.C. 2000).

excessive and unreasonable force in arresting him. (Compl. 5-6.) Plaintiff alleges that, as a result of the encounter with LeConey, he suffered "a closed head injury." (Id. at 5.) He seeks $70,000 in damages for pain and suffering due to mental and physical distress, and he also seeks the cost of a $160 jacket that was ripped as a result of his arrest. (Id. at 6.)

On 21 June 2010, the court dismissed plaintiff's claim under 42 U.S.C. § 1983 to the extent that it was brought against LeConey in his official capacity. (DE # 11.) Plaintiff's § 1983 claim against LeConey in his individual capacity was allowed to proceed. (Id.) LeConey now moves for summary judgment.

B.    Factual Background

Because LeConey and plaintiff have provided differing versions of the relevant events that transpired in this case, the court will set out the parties' factual allegations in turn.

1.    LeConey's version

On the evening of 31 March 2009, LeConey and Officer K. M. Crocker ("Crocker") were on-duty Raleigh Police Department officers. (LeConey Decl., DE # 35-1, ¶ 9; Crocker Decl., DE # 35-2, ¶ 6.) LeConey and Crocker had been assigned to the downtown district of the Field Operations Division of the Raleigh Police Department for many years prior to 31 March 2009, and their primary law enforcement duties included patrolling downtown Raleigh. (LeConey Decl. ¶ 3; Crocker Decl. ¶ 2.)

While patrolling downtown Raleigh, LeConey and Crocker had observed the conduct of individuals begging for money from pedestrians on numerous occasions. (LeConey Decl. ¶ 6; Crocker Decl. ¶ 3.) Both LeConey and Crocker had interacted with individuals begging for money and had issued citations for violations of the applicable Raleigh City Code provisions.

(Id.)  In their roles as law enforcement officers, LeConey and Crocker had also gained

substantial experience interacting with intoxicated and combative individuals.  (LeConey Decl.

¶¶ 7-8; Crocker Decl. ¶¶ 4-5.)

At approximately 10:25 p.m. on the evening of 31 March 2009, LeConey and Crocker

were engaged in bicycle patrol of the downtown Raleigh area when they witnessed plaintiff on

Wilmington Street in front of Taz's convenience store ("Taz's").  (LeConey Decl. ¶¶ 10-11;

Crocker Decl. ¶¶ 7-8.)  On numerous occasions, the officers had observed individuals in the area

of Taz's loitering, drinking alcohol, or begging for money from pedestrians.  (LeConey Decl. ¶

12; Crocker Decl. ¶ 9.)  When two pedestrians approached plaintiff's location, the officers

observed plaintiff step into the pedestrians' path, blocking their progress.  (LeConey Decl. ¶¶

14-15; Crocker Decl. ¶¶ 10-11.)  Plaintiff began speaking to the pedestrians while extending his

hand toward them.  (Id.)  Plaintiff stepped out of the pedestrians' path and allowed them to pass

only after one of the pedestrians handed something to plaintiff.  (LeConey Decl. ¶ 15.)  Based on

the officers' observations and their law enforcement experience, they concluded that plaintiff's

conduct was consistent with unlawful begging.  (LeConey Decl. ¶ 16; Crocker Decl. ¶ 12.)

The officers crossed Wilmington Street to investigate further, and they stopped their

bicycles within a few feet of plaintiff.  (LeConey Decl. ¶¶ 17-18; Crocker Decl. ¶¶ 13-14.)

Before communicating with plaintiff, both officers observed that plaintiff's appearance was

disheveled, that he had bloodshot eyes, and that he smelled of alcohol.  (LeConey Decl. ¶ 18;

Crocker Decl. ¶¶ 15-16.)  When LeConey asked for plaintiff's name, plaintiff's facial expression

became angry, his body posture stiffened, and he inserted his clenched fists into his pockets

before responding "Eric" in a curt and impatient tone.  (LeConey Decl. ¶ 19; Crocker Decl. ¶

17.)  Plaintiff then ignored LeConey's request for his full name and responded instead with a loud, profane, and insulting verbal assault which would continue unabated throughout the encounter.  (LeConey Decl. ¶¶ 20, 29, 31, 38, 41, 46-48, 52, 55, 61; Crocker Decl. ¶¶ 18-19, 24, 26, 30, 34, 41.)  Plaintiff also ignored LeConey's requests to remove his hands from his pockets.  (LeConey Decl. ¶¶ 25, 31-35; Crocker Decl. ¶¶ 25-26.)

Because plaintiff refused to cooperate, LeConey advised plaintiff that he was being placed under arrest and began attempting to handcuff him.  (LeConey Decl. ¶ 23; Crocker Decl. ¶¶ 20-22.)  Plaintiff remained rigidly erect and resisted LeConey's attempts to identify the contents of his hands and pockets.  (LeConey Decl. ¶¶ 25-28; Crocker Decl. ¶ 22.)  He also resisted LeConey's attempts to place him in handcuffs.  (LeConey Decl. ¶ 34; Crocker Decl. ¶ 22.)  Even when he began to lose his balance and topple over, plaintiff refused to move his arms, legs, or body in order to maintain his balance.  (LeConey Decl. ¶¶ 25-28, 30; Crocker Decl. ¶ 23.)  Plaintiff began to fall, and LeConey was forced to bear the weight of plaintiff's body and lower him to the sidewalk.  (LeConey Decl. ¶ 30; Crocker Decl. ¶ 23.)  With plaintiff lying stiffly on the sidewalk, Crocker assisted LeConey in removing plaintiff's hands from his pockets, securing plaintiff's wrists in handcuffs, prying plaintiff's clenched fists open, and conducting a search incident to arrest.  (LeConey Decl. ¶¶ 31-40; Crocker Decl. ¶¶ 26-27.)  Plaintiff remained non-compliant, loud, and verbally abusive throughout the encounter.  (LeConey Decl. ¶¶ 41, 61; Crocker Decl. ¶ 41.)

Upon arrival at the jail, plaintiff claimed that LeConey had smashed his head against a wall and that plaintiff could not see anything out of his left eye.  (LeConey Decl. ¶ 52; Crocker Decl. ¶ 33.)  Plaintiff demanded medical treatment.  (LeConey Decl. ¶¶ 52, 55; Crocker Decl. ¶

4

35.)  The officers followed standard Raleigh Police Department procedures and requested medical assistance.  (LeConey Decl. ¶ 54.)  Plaintiff was transported to Wake Medical Center in Raleigh in the custody of other law enforcement officers.  (LeConey Decl. ¶ 57; Crocker Decl. ¶¶ 37-38.)  Upon his return from the emergency room, plaintiff was charged with unlawful begging in violation of Raleigh Civil Code §§ 13-2007 and 13-2031, being intoxicated and disruptive in violation of N.C. Gen. Stat. § 14-444, and unlawfully resisting, delaying or obstructing a public officer in violation of N.C. Gen. Stat. § 14-223.  (LeConey Decl. ¶¶ 16, 42, 58; Crocker Decl. ¶ 12; LeConey's Mem. Supp. Mot. Summ. J., DE # 35, at 13.)  These charges were subsequently dismissed when plaintiff entered a guilty plea in connection with a separate arrest by another law enforcement officer.  (LeConey Decl. ¶ 58; <u>see</u> <u>also</u> Pl.'s Dep., DE # 35-3, at 73-74.)

    2.  <u>Plaintiff's version</u>

Plaintiff's own accounts of the events relevant to this lawsuit have been inconsistent.  In response to discovery, plaintiff originally stated that, prior to his encounter with LeConey, he had spent the day working as a day laborer at a construction site picking up trash.  (Pl.'s Resp. to Disc., DE # 25, ¶ 6.)[3]  However, plaintiff testified in his deposition that he had spent most of the day helping an acquaintance move from her home.  (Pl.'s Dep. 39-40.)  Plaintiff then went to a nightclub/bar called "Two T's" in downtown Raleigh.  (<u>Id.</u> at 38.)  In response to discovery, plaintiff stated that he had been "dead sober" for the 24-hour period preceding his arrest as he "had not been paid from daily work outside food and bus fare."  (Pl.'s Resp. to Disc., DE # 25, ¶ 8.)

---

[3] Plaintiff verified the accuracy of his interrogatory responses during his deposition.  (Pl.'s Dep. 32-34.)

In contrast, plaintiff testified in his deposition that he was paid thirty-five dollars for his work on 31 March 2009 and that he had consumed two beers at Two T's immediately prior to his arrest. (Pl.'s Dep. 42, 93.) Plaintiff had between three and four dollars in change remaining when he left Two T's, and he proceeded immediately to Taz's at approximately 10:10 p.m. (Pl.'s Dep. 42-44.) The money in plaintiff's possession included approximately sixty cents in pennies. (Id. at 45.) In response to discovery, plaintiff simply stated that he entered Taz's and "engaged in conversation with [the] clerk before stepping onto [the] sidewalk." (Pl.'s Resp. to Disc., DE # 25, ¶ 6.) However, he gave a more detailed account during his deposition. In his deposition, plaintiff testified that he had intended to purchase a bag of Doritos at Taz's. (Pl.'s Dep. 93.) The store clerk told plaintiff that he would not accept plaintiff's pennies unless they were rolled. (Id. at 43.) Plaintiff then exited Taz's onto the public sidewalk in an attempt to find someone willing to exchange his pennies for other denominations. (Id. at 44-47.) Plaintiff testified that he explained his situation to two passing pedestrians, and one of the pedestrians gave plaintiff several coins while declining plaintiff's pennies in exchange.[4] (Id.) Plaintiff testified that he did not know the pedestrians that he approached on 31 March 2009. (Pl.'s Dep. 47, 89.)

In contrast to the above account, plaintiff has provided statements indicating that he was "familiar with" the two pedestrians that he approached on the night of 31 March 2009. (Pl.'s Aff. & Decl., DE # 38, at 5; Pl.'s 2d Req. Admis., DE # 28, ¶ 3.) In one of his declarations, he states that he and the pedestrians "had talked earlier inside Two-T's bar . . . ." (Pl.'s Aff. &

---

[4] Plaintiff also testified that he asked one of the pedestrians a question about the coat that the pedestrian was wearing. (Pl.'s Dep. 45-46.)

Decl., DE # 38, at 5.)  Furthermore, plaintiff has contradicted his deposition testimony regarding his reason for approaching the pedestrians.  Instead of seeking to exchange pennies, he indicates that he asked the pedestrians for change for a dollar.  (See id.; Pl.'s 2d Req. Admis., DE # 28, ¶¶ 2-3.)

Putting aside plaintiff's conflicting evidence relating to his encounter with the pedestrians, plaintiff testified that he saw LeConey and Crocker staring at him from across the street and that the officers approached him around 10:25 p.m.  (Pl.'s Dep. 47, 92, 111.)  Plaintiff believes that Crocker recognized him because Crocker had charged him with resisting arrest a few months earlier.  (Id. at 74, 111.)  Plaintiff provides very few specific details regarding the encounter with LeConey.  He maintains that he was cooperative during the encounter, that he produced his identification upon request, and that he did not resist the officers in any way.  (Id. at 93, 117; Pl.'s Resp. to Disc., DE # 25, ¶¶ 6, 9-10.)  He also denies using any profane language on the night of 31 March 2009.  (See, e.g., Pl.'s Aff. & Decl., DE # 38, at 7; Pl.'s Decl., DE # 40, at 2.)

Despite his cooperation with the officers' requests, plaintiff alleges that Leconey "slam[med] my head up against the wall because I questioned him why was he arresting me." (Pl.'s Dep. 93; see also id. at 117; Compl. 5; Med. Rs., DE # 39-2, at 1; Pl.'s Resp. to Disc., DE # 25, ¶¶ 6, 9-10.)  In one of his declarations, plaintiff further explains that "LeConey slammed [plaintiff's] head into a brick wall and then onto the ground where his Mountain Hardwear coat was ripped."  (Pl.'s Aff. & Decl., DE # 38, at 7; see also Compl. 6 (plaintiff's jacket was ripped "as a result of being hurled to the pavement"); Pl.'s Resp. to Disc., DE # 25, ¶¶ 6, 10 (indicating that plaintiff was "slammed to the ground"); Med. Rs., DE # 39-2, at 6-7.)  As a result of this

7

treatment by LeConey, plaintiff maintains that he sustained "a closed head injury." (Compl. 5; see also Pl.'s Dep. 87; Pl.'s Aff. & Decl., DE # 38, at 7.) This was the only injury that he allegedly sustained in relation to his arrest on the night of 31 March 2009. (Pl.'s Dep. 86.) Plaintiff was treated that night at Wake Medical Center in Raleigh, where he complained of vision problems involving his left eye, eye pain, and an aching pain in his head. (Med. Rs., DE # 39-2, at 1, 6.)

## II. DISCUSSION

A.    <u>Summary Judgment Standard</u>

Summary judgment is proper only if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment should be granted only in those cases "in which it is perfectly clear that no genuine issue of material fact remains unresolved and inquiry into the facts is unnecessary to clarify the application of the law." <u>Haavistola v. Cmty. Fire Co. of Rising Sun, Inc.</u>, 6 F.3d 211, 214 (4th Cir. 1993). "[T]he substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

In considering a motion for summary judgment, the court is required to draw all reasonable inferences in favor of the non-moving party and to view the facts in the light most favorable to the non-moving party. <u>Anderson</u>, 477 U.S. at 255. The moving party has the burden to show an absence of evidence to support the non-moving party's case. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986). The party opposing summary judgment must then

8

demonstrate that a triable issue of fact exists; he may not rest upon mere allegations or denials. Anderson, 477 U.S. at 248. A mere scintilla of evidence supporting the case is insufficient. Id. at 252. "[W]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate." Teamsters Joint Council No. 83 v. Centra, Inc., 947 F.2d 115, 119 (4th Cir. 1991).

Here, plaintiff is proceeding *pro se*. Pleadings drafted by a *pro se* litigant are held to a less stringent standard than those drafted by attorneys. See Haines v. Kerner, 404 U.S. 519, 520 (1972). This court is charged with liberally construing a pleading filed by a *pro se* litigant to allow for the development of a potentially meritorious claim. See id.; Noble v. Barnett, 24 F.3d 582, 587 n.6 (4th Cir. 1994); Gordon v. Leeke, 574 F.2d 1147, 1151 (4th Cir. 1978).

B.    Section 1983 Claims and Qualifed Immunity Defense

Plaintiff alleges three Fourth Amendment claims under 42 U.S.C. § 1983: first, that LeConey lacked probable cause to arrest him; second, that he was subject to an unlawful search incident to his arrest; and third, that LeConey used excessive force in arresting him. LeConey contends that he is entitled to qualified immunity on each claim. As a result, it will be helpful to begin with an overview of the qualified immunity doctrine before discussing the law underlying plaintiff's substantive claims.

The affirmative defense of qualified immunity protects law enforcement officers against lawsuits seeking money damages from them in their individual capacity. See, e.g., Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Unus v. Kane, 565 F.3d 103, 123 (4th Cir. 2009), cert. denied, 130 S. Ct. 1137 (2010). "Because qualified immunity is designed to shield officers not only from liability but from the burdens of litigation, its establishment at the pleading or

9

summary judgment stage has been specifically encouraged." Pritchett v. Alford, 973 F.2d 307, 313 (4th Cir. 1992). The Fourth Circuit Court of Appeals has stated that "[t]his does not mean, however, that summary judgment doctrine is to be skewed from its ordinary operation to give special substantive favor to the defense, important as may be its early establishment." Id. Defendant officials have the burden of pleading and proving qualified immunity. See, e.g., Cloaninger ex rel. Estate of Cloaninger v. McDevitt, 555 F.3d 324, 332 n.10 (4th Cir. 2009); Wilson v. Kittoe, 337 F.3d 392, 397 (4th Cir. 2003).

In assessing whether qualified immunity applies, courts consider two inquiries: (i) whether the facts alleged, when viewed in the light most favorable to the party asserting the injury, show the officer's conduct violated a constitutional right; and (ii) whether the right that was violated was clearly established, i.e., whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. See Saucier v. Katz, 533 U.S. 194, 201-02 (2001). A court has discretion to decide which step of the two-prong test to analyze first. Pearson v. Callahan, 129 S. Ct. 808, 818 (2009). A defendant is entitled to summary judgment on qualified immunity grounds if the answer to either question in the two-prong analysis is "no." See, e.g., Miller v. Prince George's Cnty. Md., 475 F.3d 621, 627 (4th Cir. 2007); Bostic v. Rodriguez, 667 F. Supp. 2d 591, 606 (E.D.N.C. 2009).

In most cases, the qualified immunity analysis does not require factual findings, because the issue is a "purely legal one: whether the facts alleged . . . support a claim of violation of clearly established law." Mitchell v. Forsyth, 472 U.S. 511, 528 n.9 (1985). When asserting qualified immunity at the summary judgment stage, however, a defendant may challenge the sufficiency of the evidence to support the complaint's allegations. See Cloaninger, 555 F.3d at

10

331. "In this situation, a defendant is entitled to summary judgment if the record does not create a genuine issue of material fact as to whether the defendant committed the acts alleged in the complaint." Bostic, 667 F. Supp. 2d at 606-07.

1. Unlawful arrest

"It is clearly established under the Fourth Amendment that individuals have the right to be free from unlawful seizures of their persons, including unlawful arrests." Bell v. Dawson, 144 F. Supp. 2d 454, 460 (W.D.N.C. 2001) (citing Imbler v. Pachtman, 424 U.S. 409, 418-19 (1976); Pierson v. Ray, 386 U.S. 547, 554-55 (1967)). However, "[a] warrantless arrest of an individual in a public place for a felony, or a misdemeanor committed in the officer's presence, is consistent with the Fourth Amendment if the arrest is supported by probable cause." Maryland v. Pringle, 540 U.S. 366, 370 (2003). "If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." Atwater v. City of Lago Vista, 532 U.S. 318, 354 (2001).

"An officer has probable cause for arrest when the 'facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" Kittoe, 337 F.3d at 398 (alteration in original) (quoting Pritchett, 973 F.2d at 314); see also Beck v. Ohio, 379 U.S. 89, 91 (1964). "The long-prevailing standard of probable cause protects 'citizens from rash and unreasonable interferences with privacy and from unfounded charges of crime,' while giving 'fair leeway for enforcing the law in the community's protection.'" Pringle, 540 U.S. at 370 (quoting Brinegar v. United States, 338 U.S.

11

160, 176 (1949)).  "[T]he probable-cause standard is a 'practical, nontechnical conception' that deals with 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'"  Id. (internal quotation marks omitted) (quoting Illinois v. Gates, 462 U.S. 213, 231 (1983)); see also Bostic, 667 F. Supp. 2d at 607.  The court applies a "totality-of-the-circumstances analysis" to determine whether probable cause existed.  Gates, 462 U.S. at 238; see also United States v. Dickey-Bey, 393 F.3d 449, 453 (4th Cir. 2004).  "In evaluating objective reasonableness, what the officer observed is highly relevant; his subjective beliefs are not."  Bostic, 667 F. Supp. 2d at 607.

In determining whether LeConey is entitled to qualified immunity with respect to this claim, the court begins with the question of whether LeConey's arrest of plaintiff violated plaintiff's Fourth Amendment right to be free from a warrantless arrest absent probable cause. LeConey contends that he had probable cause to arrest plaintiff for unlawful begging in violation of Raleigh City Code § 13-2031.  Pursuant to that ordinance, "[n]o begging or panhandling shall take place between the hours of 9:00 p.m. and 8:00 a.m."  Raleigh City Code § 13-2031(c) (2009).[5]  As defined in the code, the word "beg" means "to ask for money or goods as a charity, whether by words, bodily gestures, signs, or other means."  Id. § 13-2031(a)(2).  Under North Carolina law, any violation of a city ordinance is punishable as a Class 3 misdemeanor.  N.C. Gen. Stat. § 14-4(a).

Here, LeConey had probable cause to arrest plaintiff.  Plaintiff stopped two pedestrians on a public sidewalk and spoke to the pedestrians while extending one of his hands out toward

_____

[5] Raleigh City Code § 13-2031 was subsequently amended in 2011 by Raleigh City Ordinance No. 2011-836.

them.  (LeConey Decl. ¶ 15; Crocker Decl. ¶ 11.)  One of the pedestrians placed something in plaintiff's outstretched hand, and it then appeared that plaintiff was counting something in his hand.  (LeConey Decl. ¶ 15.)  Based on the officers' law enforcement experience, plaintiff's conduct was consistent with unlawful begging.  (LeConey Decl. ¶ 16; Crocker Decl. ¶ 12.)  Even under plaintiff's version of the events, LeConey had probable cause to arrest him.  Plaintiff himself admits that his conduct could have been mistaken for begging.  (Pl.'s Dep. 48; Pl.'s Decl., DE # 42, at 2 ("Plaintiff admitted that by asking for and accepting coins from a passing pedestrian, his actions may have been consisted [sic] with begging or interpreted as begging by LeConey.").)  Furthermore, plaintiff does not dispute that his 31 March 2009 arrest took place at approximately 10:25 p.m.  (Pl.'s Dep. 43-44, 92; see also LeConey Decl. ¶ 10; Crocker Decl. ¶ 7.)  Standing alone, these undisputed facts demonstrate that LeConey had probable cause to arrest plaintiff for unlawful begging in violation of Raleigh City Code § 13-2031.

Plaintiff argues that his conduct on the night of 31 March 2009 did not meet the statutory definition of "begging" because he was simply trying to exchange money.  Therefore, he did not "ask for money or goods as a charity" as described in Raleigh City Code § 13-2031(a)(2).  (See, e.g., Pl.'s Decl., DE # 40, at 2; Pl.'s Decl., DE # 42, at 2-5.)  However, evidence sufficient to sustain a conviction is not required in order to establish probable cause, and reasonable law enforcement officers "need not resolve every doubt about a suspect's guilt before probable cause is established."  Gomez v. Atkins, 296 F.3d 253, 262 (4th Cir. 2002) (citation and internal quotation marks omitted); see also Taylor v. Waters, 81 F.3d 429, 434 (4th Cir. 1996) ("Probable cause must be supported by more than a mere suspicion, but evidence sufficient to convict is not required.").  Furthermore, "[o]fficers can have reasonable, but mistaken, beliefs as to the facts

establishing the existence of probable cause . . . , and in those situations courts will not hold that they have violated the Constitution." Saucier, 533 U.S. at 206. Thus, plaintiff's argument that he was not actually begging is irrelevant to the probable cause determination.[6]

Finally, plaintiff argues that LeConey lacked probable cause to arrest him for violations of N.C. Gen. Stat. § 14-444 (intoxicated and disruptive in public) and N.C. Gen. Stat. § 14-223 (resisting, delaying or obstructing a public officer). However, having concluded that LeConey had probable cause to arrest plaintiff for unlawful begging, the court need not decide whether LeConey also had probable cause to arrest plaintiff for the other charges. See Barry v. Fowler, 902 F.2d 770, 773 n.5 (9th Cir. 1990) (finding that an officer must have probable cause for at least one charge for an arrest to withstand a Fourth Amendment challenge); Edwards v. City of Philadelphia, 860 F.2d 568, 576 (3d Cir. 1988) (same) (citing Linn v. Garcia, 531 F.2d 855, 862 (8th Cir. 1976)). As long as LeConey had probable cause for some offense, the arrest was proper. "Probable cause need only exist as to any offense that could be charged under the circumstances." Barna v. City of Perth Amboy, 42 F.3d 809, 819 (3d Cir. 1994); see also Jaegly v. Couch, 439 F.3d 149, 154 (2d Cir. 2006) ("[W]hen faced with a claim for false arrest, we focus on the validity of the arrest, and not on the validity of each charge." (emphasis in original)); Wells v. Bonner, 45 F.3d 90, 95 (5th Cir. 1995) ("If there was probable cause for any

---

[6] Similarly, it is irrelevant that the criminal charges arising from plaintiff's arrest were ultimately dismissed following the entry of plaintiff's guilty plea on an unrelated charge. See, e.g., Dolan v. Curry, 2010 WL 3724700, at *4 (D.S.C. Sept. 16, 2010); Campbell v. Smith, 2009 WL 3739351, at *5 (D.S.C. Nov. 4, 2009); Kelly v. Bencheck, 921 F. Supp. 1465, 1470 (E.D.N.C. 1996), aff'd, 107 F.3d 866 (table), 1997 WL 76041, at *2 (4th Cir. Feb. 24, 1997); Smith v. Swoope, 351 F. Supp. 159, 163 (W.D. Va. 1972) ("The authorities are clear that a dismissal of charges or an acquittal after an arrest are not dispositive of the lawfulness of the arrest itself. Indeed, such a disposition in favor of the arrestee is actually irrelevant on the issue of whether an arrest was either with or without probable cause.").

.

of the charges made . . . then the <u>arrest</u> was supported by probable cause, and the claim for false

arrest fails." (emphasis in original)); <u>Calusinski v. Kruger</u>, 24 F.3d 931, 935 (7th Cir. 1994) ("At

the time of the arrest police officers need probable cause that <u>a</u> crime has been committed, not

that the criminal defendant committed all of the crimes for which he or she is later charged."

(emphasis in original)).

Accordingly, the court concludes that plaintiff's arrest satisfied constitutional

requirements and that LeConey is entitled to qualified immunity with respect to this claim.

2. <u>Unlawful search</u>

Plaintiff also appears to argue that LeConey unlawfully searched him in violation of the

Fourth Amendment. However, because the court has already found that LeConey had probable

cause to arrest plaintiff for at least one criminal violation committed in his presence, LeConey

did not need any further justification to search plaintiff incident to arrest. As the United States

Supreme Court has explained:

> A custodial arrest of a suspect based on probable cause is a reasonable intrusion
> under the Fourth Amendment; that intrusion being lawful, a search incident to the
> arrest requires no additional justification. It is the fact of the lawful arrest which
> establishes the authority to search, and we hold that in the case of a lawful
> custodial arrest a full search of the person is not only an exception to the warrant
> requirement of the Fourth Amendment, but is also a "reasonable" search under
> that Amendment.

<u>United States v. Robinson</u>, 414 U.S. 218, 235 (1973); <u>see</u> <u>also</u> <u>Virginia v. Moore</u>, 553 U.S. 164,

178 (2008) ("When officers have probable cause to believe that a person has committed a crime

in their presence, the Fourth Amendment permits them to make an arrest, and to search the

suspect in order to safeguard evidence and ensure their own safety."). Because plaintiff's arrest

was supported by probable cause, LeConey's search incident to arrest was permitted by the

15

Fourth Amendment. Thus, LeConey is entitled to qualified immunity with respect to this claim.

### 3. Excessive force

The Fourth Amendment[7] prohibition against unreasonable seizures bars police officers from using excessive force during an arrest. <u>Graham v. Connor</u>, 490 U.S. 386, 394 (1989). A court's determination of whether an officer uses excessive force to effect a seizure is based on a standard of "objective reasonableness." <u>Id.</u> at 399 (internal quotation marks omitted). The court weighs "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." <u>Id.</u> at 396 (citations and internal quotation marks omitted). The test requires careful attention to the facts and circumstances of each particular case. <u>Id.</u> "The extent of the plaintiff's injury is also a relevant consideration." <u>Jones v. Buchanan</u>, 325 F.3d 520, 527 (4th Cir. 2003). The court must determine whether the totality of circumstances justified a particular sort of seizure. <u>Id.</u> at 527-28.

The parties have submitted conflicting accounts relating to the amount of force used during the arrest. However, at the summary judgment stage, the court must consider the evidence in the light most favorable to the non-moving party, <i>i.e.</i>, plaintiff. <u>Anderson</u>, 477 U.S. at 255. In the four declarations that plaintiff has submitted in this case, he spends a great deal of time attempting to refute the allegations made by LeConey, but he does not provide a complete and coherent picture of his version of the events that transpired once LeConey and Crocker approached him on the night of 31 March 2009. He provides minimal evidence to support his

---

[7] "The Fourth Amendment governs claims of excessive force during the course of an arrest, investigatory stop, or other 'seizure' of a person." <u>Riley v. Dorton</u>, 115 F.3d 1159, 1161 (4th Cir. 1997) (en banc), <u>abrogated on other grounds</u>, <u>Wilkins v. Gaddy</u>, 130 S. Ct. 1175 (2010). Thereafter, the Fourteenth Amendment due process clause protects a pre-trial detainee from the use of excessive force that amounts to punishment. <u>Graham v. Connor</u>, 490 U.S. 386, 395 n.10 (1989). In this case, the Fourth Amendment applies to plaintiff's excessive force claim because the alleged events transpired incident to his being taken into custody.

excessive force claim, and the few allegations that he does make are either vague or conclusory. As a result, the court has attempted to liberally construe the facts as alleged in assessing plaintiff's claims.

Plaintiff maintains that he was completely cooperative during the encounter with LeConey, that he produced his identification upon request, and that he did not resist the officers in any way. (Pl.'s Dep. 93, 117; Pl.'s Resp. to Disc., DE # 25, ¶¶ 6, 9-10.) He also denies using any profane language on the night of 31 March 2009. (See, e.g., Pl.'s Aff. & Decl., DE # 38, at 7; Pl.'s Decl., DE # 40, at 2.) Despite his cooperation, plaintiff contends that he was slammed into a wall and/or slammed to the ground for asking why he was being arrested.[8] (Compl. 5; Pl.'s Resp. to Disc., DE # 25, ¶¶ 6, 9-10; Pl.'s Dep. 93, 117; Pl.'s Aff. & Decl., DE # 38, at 7; Med. Rs., DE # 39-2, at 1, 6-7.) As a result of this treatment by LeConey, plaintiff's sole claim is that he sustained a "closed head injury." (Compl. 5; see also Pl.'s Dep. 86-87; Pl.'s Aff. & Decl., DE # 38, at 7.) On the night of his arrest, plaintiff was treated at Wake Medical Center in Raleigh, where he complained of vision problems involving his left eye, eye pain, and an aching pain in his head. (Med. Rs., DE # 39-2, at 1, 6; see also Compl. 5.) Plaintiff also testified that the incident with LeConey resulted in a swollen knot on his head that lasted until at least 17 April 2009 and that he suffered from headaches for about a month after his arrest. (Pl.'s Dep. 87-88.)

Here, other than plaintiff's own subjective assertions, there is no indication in the

---

[8] It is unclear from the record whether plaintiff was slammed into a wall, slammed to the ground, or both. This lack of clarity does not create a genuine issue of material fact for purposes of a motion for summary judgment. The Fourth Circuit Court of Appeals has stated that "[a] genuine issue of material fact is not created where the only issue of fact is to determine which of the . . . conflicting versions of the plaintiff's testimony is correct." Rohrbough v. Wyeth Labs., Inc., 916 F.2d 970, 975 (4th Cir. 1990) (quoting Barwick v. Celotex Corp., 736 F.2d 946, 960 (4th Cir. 1984)).

evidence presented, including plaintiff's own evidence, that any excessive amount of force was used or that plaintiff suffered any injuries whatsoever. Despite the alleged severity of plaintiff's injury, he admits that the only medical treatment he received was at the emergency room on the night of his arrest and that he did not take any prescription medication for his pain. (Id. at 86-89.)

Furthermore, the medical records submitted by plaintiff confirm that he suffered no injuries as a result of the encounter with LeConey. While plaintiff alleges that his "closed head injury" was evidenced by a swollen knot on his head (Id. at 87), a triage note written upon plaintiff's arrival at the Wake Medical Center emergency room reflects that he had "[n]o visible signs of injury." (Med. Rs., DE # 39-2, at 1.) Similarly, a subsequent nursing assessment indicates that plaintiff had "[n]o obvious injury." (Id. at 4.) An examination revealed that plaintiff was "[w]ell appearing" and "in no acute distress." (Id. at 6.) Plaintiff's head was described as "normocephalic" and "atraumatic" with "no evidence of facial trauma." (Id.)

Most importantly, plaintiff's own medical records reveal that the treating physician believed that plaintiff's claims of injury were mere fabrications. Shortly after examining him in the emergency room, plaintiff's treating physician wrote the following assessment:

> [Patient] had no evidence of trauma anywhere on the face/head or anywhere on his body. Exam of eye unremarkable. Given exam, injuries resulting in decreased vision was not possible. Suspect patient feigned injury to avoid jail as no trauma evident. CT head, face and C-spine negative for acute pathology.

(Id. at 7 (emphasis added).)

LeConey has also produced a photograph taken of plaintiff on the night of his arrest. (LeConey Decl. ¶ 59 & Ex. B.) Plaintiff has not disputed the authenticity of the photograph. The photograph does not reveal any evidence of a head injury. No cuts, scrapes, or bruises are

18

visible on plaintiff's face. Rather, the photograph is consistent with the information contained in plaintiff's medical records indicating that there was no evidence of trauma anywhere on plaintiff's face or head. Thus, plaintiff's claim that he suffered a closed head injury is blatantly contradicted by record evidence. See Scott v. Harris, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.")

Although the court is aware that the lack of serious physical injury is not, in itself, dispositive of a Fourth Amendment excessive force claim, the "absence of [a] serious injury" nevertheless remains relevant in an excessive force inquiry. Wilkins v. Gaddy, 130 S. Ct. 1175, 1178 (2010) (citation and internal quotation marks omitted).[9] "This is true because the less serious the injury, the more likely the amount of force used was reasonable." Green v. Missouri, 734 F. Supp. 2d 814, 838 (E.D. Mo. 2010); see also Crumley v. City of St. Paul, 324 F.3d 1003, 1008 (8th Cir. 2003) ("The absence of an injury altogether suggests to us the force used here was reasonable."). Here, the lack of any injury whatsoever weighs heavily against plaintiff. Cf. Wilkins, 130 S. Ct. at 1178 ("An inmate who complains of a 'push or shove' that causes no discernible injury almost certainly fails to state a valid excessive force claim." (citation omitted)). Under the totality of the circumstances in this case, plaintiff's allegations simply do not rise to the level of objective unreasonableness necessary to sustain an excessive force claim. As previously described, plaintiff was subject to arrest, and LeConey was authorized to

---

[9] Although Wilkins arose in the context of a prisoner's excessive force claim under the Eighth Amendment, the rationales motivating Wilkins are just as compelling in the context of an excessive force claim under the Fourth Amendment.

conduct a search incident to the arrest. Even though plaintiff maintains that he was "slammed" into a wall and/or the ground, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, . . . violates the Fourth Amendment." Graham, 490 U.S. at 396 (citation and internal quotation marks omitted); see, e.g., Nolin v. Isbell, 207 F.3d 1253, 1258 & n.4 (11th Cir. 2000) (officer who grabbed plaintiff from behind, shoved him a few feet against a van, kneed him in the back and pushed his head into the side of the van used only *de minimis* force); Byrd v. Hopson, 265 F. Supp. 2d 594, 612 (W.D.N.C. 2003), aff'd in part, rev'd in part on other grounds, 108 Fed. Appx. 749 (4th Cir. 2004) (collecting cases involving the use of *de minimis* force). Furthermore, plaintiff's allegations regarding the excessive force claim are so conclusory and devoid of facts and circumstances that they do not warrant the burden or expense of a jury trial. See, e.g., Edwards v. Giles, 51 F.3d 155, 157 (8th Cir. 1995) (plaintiff's abstract and generalized assertions that an officer "threw [him] to the ground" and that he "was thrown to the ground forcibly" were insufficient to defeat summary judgment motion as they did not give the "slightest hint" about the amount of force that the officer used (internal quotation marks omitted)); Smith v. Cooper, 2011 WL 1376100, at *9 (D.S.C. Apr. 12, 2011) (Fourth Amendment excessive force claim failed where plaintiff's allegations of injury were "vague and inconclusive" and defendants presented "a variety of [medical] records [to] show that plaintiff did not suffer any significant injuries as a result of defendants' alleged excessive force"); Byrd, 265 F. Supp. 2d at 613 ("Indeed, [Byrd] has not even adduced any evidence of the force used against [her] (or of the character of the encounter in general) other than [her] own subjective assertions that [she] was ['jerked'] and that [she] was 'pushed [into the edge of a door]' and that [she] experienced [pain]. Manifestly, this is not sufficient." (alterations in original) (citation and

20

internal quotation marks omitted)).

The court concludes that LeConey's use of force was not excessive and that plaintiff has failed to establish a violation of his rights under the Fourth Amendment. Accordingly, LeConey is entitled to qualified immunity on the excessive force claim because his alleged conduct did not violate a constitutional right.

C.      Remaining Issues

It is unclear whether the *pro se* plaintiff also seeks to assert state tort law claims as part of this action. "In North Carolina, findings that an arrest was supported by probable cause and that a law enforcement officer's use of force was 'reasonable' for the purposes of finding qualified immunity to a § 1983 excessive force claim are fatal to [a] Plaintiff's state law tort claims." Bell v. Dawson, 144 F. Supp. 2d 454, 464 (W.D.N.C. 2001) (collecting cases). Thus, based on the court's findings in this case, plaintiff cannot succeed on any state law tort claims that he may be attempting to assert.

The court also notes that LeConey has made a request for judicial notice with respect to plaintiff's criminal records and other documents. (DE # 33.) Because the court did not rely on any of these documents to resolve the motion for summary judgment, the request for judicial notice will be denied as moot.

Finally, in his motion for summary judgment, LeConey asks the court to impose various sanctions on plaintiff. (Mot. Summ. J., DE # 34, at 1-2.) However, LeConey has failed to address the legal standard for awarding sanctions, nor has he cited any authority in support of his position. As a result, the request for sanctions will be denied.

### III. CONCLUSION

The court has considered all of the parties' arguments, the record of this matter, and the relevant legal precedent, and has concluded that there is no genuine dispute of material fact and that LeConey is therefore entitled to judgment as a matter of law. As a result, LeConey's motion for summary judgment (DE # 34) is GRANTED. LeConey's request for judicial notice (DE # 33) and his motion to continue (DE # 47) are DENIED AS MOOT, and his request for sanctions is DENIED. All of plaintiff's remaining motions (DE ## 29, 30, 32, 39) are DENIED AS MOOT. The Clerk is directed to enter judgment in favor of LeConey and close the case.

This 31 May 2011.

_____
W. Earl Britt
Senior U.S. District Judge